**5IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| JENNER TORRENCE, | ) | |
| Plaintiff, | ) | No. 24-258 |
| v. | ) | Filed: August 10, 2026 |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Plaintiff Jenner Torrence alleges that the District of Columbia Air National Guard ("D.C. ANG") improperly curtailed his tour as an Active Guard and Reserve ("AGR") Officer, which deprived him of active duty pay and other benefits he would have received but for his curtailment. The D.C. ANG curtailed Plaintiff's tour after Plaintiff received two separate Letters of Reprimand ("LORs") that found he violated U.S. Air Force standards. The first LOR was premised on an investigative finding that Plaintiff engaged in an unprofessional relationship with a fellow officer, while the second LOR was premised on an investigative finding that he fraternized with an enlisted Airman and made false statements about the incident. The same findings resulted in the referral of his 2017–2018 Officer Performance Report ("OPR"), and ultimately led the D.C. ANG to curtail his tour.

After the Air Force Board for Correction of Military Records ("Board") denied Plaintiff's request to correct his military record, Plaintiff brought suit in this Court. Following a remand to consider certain evidence, the Board again denied Plaintiff relief. In this action, Plaintiff challenges the Board's decision as arbitrary, capricious, and unsupported by substantial evidence, arguing that: (1) the Commanding Officer who issued the first LOR lacked the authority to do so;

(2) Plaintiff was denied an opportunity to rebut certain evidence on which the first LOR relied; and (3) both LORs were procedurally improper because they were not supported by a preponderance of the evidence and misapplied applicable military regulations. Before the Court are Plaintiff's Motion for Judgment on the Administrative Record and Defendant's Cross-Motion for Judgment on the Administrative Record. For the following reasons, the Court **DENIES** Plaintiff's Motion and **GRANTS** Defendant's Motion.

## I. BACKGROUND

### A. Factual and Procedural Background

Plaintiff is a retired lieutenant colonel in the D.C. ANG. Commissioned on June 10, 2000, Plaintiff served as a pilot in the Air Force until April 29, 2012, when he was released from active duty to join the D.C. ANG. *See* Admin. R. ("AR") at 203, 640, 681, 686.[1] From March 29, 2016, to June 30, 2018, Plaintiff served in AGR status. AR 640–43. On June 30, 2018, Plaintiff was involuntarily removed from full-time AGR status after the Commanding General of the D.C. ANG elected to curtail Plaintiff's tour. AR 564, 640. Plaintiff's curtailment was the result of substantiated allegations of misconduct underlying two LORs, which are summarized below. AR 564; *see* AR 285, 354. Plaintiff retired from the Air Force on March 1, 2022. AR 608–09.

#### 1. <u>The First LOR</u>

Plaintiff was deployed to Guam between December 22, 2016, and February 8, 2017, as part of an overseas Theater Support Package in federal active-duty status (*i.e.*, Title 10 status). AR 277, 321. As such, he was subject to the laws and regulations governing the Air Force. *See* 10 U.S.C. § 12405; *see also* AR 277. While deployed, Plaintiff allegedly engaged in an

[1] On July 25, 2024, the Government filed the Administrative Record. *See* Admin. R., ECF No. 10. On June 18, 2025, after remand proceedings, it filed a supplement. *See* Admin. R. Part II, ECF No. 26. In this opinion, all citations refer to the Administrative Record as "AR" and use the bates-labeled page numbers included in the filings.

unprofessional relationship with a female officer in his unit ("Major A.M."), which formed the basis for Plaintiff's first LOR. Plaintiff's commander, Colonel John Vargas, issued Plaintiff's first LOR on June 13, 2017. AR 285. The LOR reprimanded Plaintiff "for displaying poor judgment and fail[ing] to fulfill [his] responsibilities as a Field Grade Officer" by engaging in an unprofessional relationship with a fellow officer.[2] *Id.* Referencing Air Force Instruction ("AFI") 1-1, *Air Force Standards* (Aug. 7, 2012), and AFI 36-2909, *Professional and Unprofessional Relationships* (May 1, 1999), the LOR concluded that Plaintiff's actions during the December 2016 to May 2017 deployment violated those standards because they "were prejudicial to good order and discipline, and were of a nature to bring discredit upon the Armed Forces of the United States." *Id.*

The LOR was issued following a Commander Directed Investigation ("CDI"), dated May 31, 2017, which was initiated to investigate an Airman's report that Plaintiff and Major A.M. had sexual intercourse in an intelligence vault at Joint Base Andrews. AR 271–73. While the investigating officer ("IO") did not substantiate that separate claim, the suspicion of (at a minimum) an unprofessional relationship between Plaintiff and Major A.M. arose based on several witness reports detailing "a long series of events" dating back to the Guam deployment. AR 273–74. The IO thus expanded his inquiry into whether Plaintiff and Major A.M. engaged in "an extramarital affair or unprofessional relationship that was prejudicial to good order and discipline or was of a nature to bring discredit upon the [A]rmed [F]orces of the [U]nited [S]tates in violation of AFI 1-1 and AFI 36-2909." AR 274.

[2] Plaintiff and Major A.M. were of equal rank during the Guam deployment. *See* AR 283 (describing each of them as commissioned officers). Moreover, Plaintiff represents that during the deployment they "were not in senior/subordinate positions (i.e., neither of them worked for or supervised the other)." Pl.'s Resp. and Reply at 5, ECF No. 35.

The IO ultimately substantiated the allegation that Plaintiff and Major A.M. engaged in an unprofessional relationship. AR 283. The IO's report summarized numerous witness interviews indicating that fellow unit members in Guam began noticing that Plaintiff and Major A.M. spent a lot of time together, arrived at work and left work in the same car, ate meals together, and acted oddly when Plaintiff's wife visited during the deployment. AR 278. Two witnesses, a Deputy Commander and a fellow officer, each talked to Plaintiff and Major A.M. about the appearance of an inappropriate relationship and the rumors circulating in the unit. AR 278–79. The IO noted that the Deputy Commander told Plaintiff and Major A.M. to "knock off" this behavior early in the deployment. AR 280. The IO also found that the appearance of an unprofessional relationship led to the sacrifice of good order and discipline in the unit because Plaintiff and Major A.M. did not correct their conduct after being counselled by the Deputy Commander and because of the rumors spreading through the unit. AR 283.

After Colonel Vargas issued the LOR based on his review of the IO's findings, Plaintiff submitted a written rebuttal. AR 289–332. Colonel Vargas considered the rebuttal but chose to sustain the LOR. AR 287.

2. The Second LOR

The second LOR concerned Plaintiff's conduct with a female enlisted Airman at a hotel bar in Tucson, Arizona, on October 16, 2017, while he was on temporary duty for the Air Force's Weapons and Tactics Conference ("WEPTAC"). AR 344–45. Colonel Vargas issued this LOR on January 26, 2018, reprimanding Plaintiff because he "fraternized with an enlisted member and engaged in unprofessional behavior; a discredit to an officer of [his] rank, the Air Force, and the Armed Forces." AR 354. The reprimand also concluded that Plaintiff "ma[d]e false verbal and written statements" about what occurred on the night in question and that his behavior and false

statements "were prejudicial to good order and discipline, contrary to the core values of the [Air Force], unbecoming of a field grade officer in the [Air Force], and were of a nature to bring discredit upon the Armed Forces of the United States in violation of AFIs 1-1 and 36-2909." *Id.*

Like the first LOR, the second LOR was based on a CDI. In this CDI, dated January 18, 2019, a different IO substantiated the allegation that Plaintiff had engaged in an unprofessional manner (*i.e.*, he fraternized) with a female enlisted member of the Toledo Air National Guard at the bar of the hotel where WEPTAC was being held. AR 344–46. The IO based this conclusion on her review of the security video footage from the bar and photographs that a fellow officer in Plaintiff's unit took of Plaintiff and the enlisted woman, which showed Plaintiff, in uniform, and the enlisted woman, wearing civilian clothes, in close physical contact at the bar. *Id.* The IO also interviewed witnesses, including the officer who took the photographs and another officer present at the time. The latter witness identified the enlisted woman as part of a group of enlisted women working on the WEPTAC services team. AR 344–45. The officer stated that, notwithstanding their civilian clothes, he "would think anyone would know that the women at the bar were the enlisted service women working refreshments" at the conference. AR 345. The IO further concluded that Plaintiff made false statements about the incident, as demonstrated through the inconsistencies between witness statements, Plaintiff's texts, Plaintiff's sworn statement and written submission, and the video and photographic evidence of the night in question. AR 350.

Colonel Vargas reviewed the evidence presented in the CDI and determined that it warranted a LOR. AR 354. As with the first LOR, Plaintiff submitted a written rebuttal to the second LOR. AR 358–77. Colonel Vargas considered the rebuttal but, again, chose to sustain the LOR. AR 356.

3. The Curtailment Decision

The consequence of the LORs was the curtailment of Plaintiff's AGR tour. On March 15, 2018, Brigadier General Jeffrey Bozard recommended curtailment "due to substantiated allegations of false statements made to senior Air Force officers and substantiated allegations of unprofessional relationships with both officer and enlisted military members." AR 564 (referencing the CDIs and the resulting LORs). The curtailment letter listed several attachments, including the IO reports of the two CDIs, the two LORs with Plaintiff's rebuttals, and two additional witness statements from January 2018. *Id.* Based on this recommendation, the D.C. ANG released Plaintiff from active duty on June 30, 2018. AR 640.

4. The OPR Referral

On May 31, 2019, Plaintiff received notification that his OPR for the 2017–2018 rating period was being referred to him, meaning he was being given the opportunity to respond and/or rebut negative findings or comments, according to AFI 36-2406, *Officer and Enlisted Evaluation Systems*, ¶ 1.10 (Nov. 8, 2016). AR 379. The OPR rated Plaintiff as not meeting standards for three performance factors: leadership skills, professional qualities, and judgment and decisions. *See* AR 408. Specifically, the report indicated that, during the previous period, Plaintiff "engaged in an unprofessional relationship with a junior officer in the same group," "fraternized with an enlisted member of another [ANG] unit," and "was untruthful about these relationships/encounters when questioned by his chain of command." *Id.* Plaintiff submitted a written rebuttal to the referred OPR on August 17, 2019. AR 395–404. In response, Colonel Vargas revised the OPR by removing a bullet point related to performance outside the relevant rating period. AR 392; *see* AR 390–91. Plaintiff also submitted a written rebuttal to this revised OPR on September 14, 2019. AR 425–30. The record does not reflect any further action.

5. Plaintiff's Petition with the Board and the Present Action

Plaintiff filed a petition for correction with the Board on June 22, 2021, seeking to remove the LORs and OPR from his file. AR 249–51. The Board denied his request for relief on April 26, 2022. AR 242–48. The Board found that Plaintiff did not meet his burden of proof to overcome the presumption of regularity afforded to government officials in the exercise of their duties, that the evidence reviewed during the CDIs was sufficient to support the investigative findings, and that Plaintiff was not reprised against in violation of military whistleblower protections. AR 246.

Plaintiff filed suit in this Court on February 20, 2024, challenging the Board's decision to deny his petition. *See* Pl.'s Compl., ECF No. 1. After the Government filed the AR, *see* ECF No. 10, the parties jointly moved to remand the case to the Board because the security video footage that formed part of the evidentiary basis for the second IO report and the second LOR had not been before the Board when it made its decision. *See* Joint Mot. to Remand, ECF No. 11. The Court granted the parties' request, stayed the case, and ordered the Board to consider the security video footage. *See* Order, ECF No. 12. Plaintiff thereafter filed a petition for reconsideration with the Board on October 3, 2024, which the Board denied on April 21, 2025. *See* Dec. on Remand, ECF No. 18; AR 232–41. It found that the security video footage and photographs supported the investigative findings of the second CDI and that Plaintiff's conduct met the Air Force's standard of an unprofessional relationship (fraternization). AR 239. The Board further held that both CDIs were conducted in accordance with the law, appropriately applied the standards provided in the relevant Air Force instructions, and were supported by the evidence. AR 240. Finally, the Board held that Colonel Vargas had the authority to discipline Plaintiff based on his inappropriate relationship with Major A.M. during the Guam deployment when Plaintiff was in Title 10 status

because of the "federal nexus between the officer's ANG membership and a violation of law or federal military standards." *Id.*

Consistent with the Court's scheduling order, on June 4, 2025, Plaintiff filed an Amended Complaint. *See* Pl.'s Am. Compl., ECF No. 24. The Government supplemented the Administrative Record on June 18, 2025, with the record of the remand proceedings. *See* ECF No. 26. The Government also filed copies of the security video footage and photographs on a portable drive. *See* ECF Nos. 27, 28.

Plaintiff filed his Motion for Judgment on the Administrative Record on July 23, 2025, arguing that: (1) the CDIs and LORs were procedurally improper because they were not supported by a preponderance of the evidence and, with respect to the first CDI and LOR, were based on a misinterpretation of the relevant Air Force instruction; (2) the first LOR was procedurally improper because it rested on evidence Plaintiff was not allowed to rebut; (3) Colonel Vargas did not have authority to issue the first LOR; and (4) the Board's findings were arbitrary, capricious, and unsupported by substantial evidence. *See generally* Pl.'s Mot. for J. on Admin. R., ECF No. 31. The Government filed its Response and Cross-Motion for Judgment on the Administrative Record on September 10, 2025. *See generally* Gov't's Resp. and Cross-Mot. for J. on Admin. R., ECF No. 34. The motions are now fully briefed. *See* Pl.'s Resp. and Reply, ECF No. 35; Gov't's Reply, ECF No. 39. The Court held oral argument on May 22, 2026. *See* Min. Entry (May 22, 2026).

### B. Statutory and Regulatory Framework

#### 1. Standards for Conducting CDIs and Issuing LORs

Department of the Air Force Manual ("DAFMAN") 1-101, *Commander Directed Investigations* (April 9, 2021), which implements Air Force Policy Directive 1, *Air Force Culture*, outlines the procedures for CDIs. DAFMAN 1-101 ¶ 3.1.1 advises that "CDIs may be used to

investigate whether an individual has violated a standard defined by law, regulation, or policy." Paragraph 1.4 states that the standard of proof for CDIs is a preponderance of the evidence. It also states that IOs "must use their own common sense, life experiences and knowledge of the ways of the world to assess the credibility of witnesses they interview and the evidence gathered in the investigation."[3] *Id.*

AFI 36-2907, *Unfavorable Information File (UIF) Program* (Nov. 26, 2014), implements Air Force Policy Directive 36-29, *Military Standards*, and establishes procedures for managing documents for the Unfavorable Information File program. The instruction applies to all Air Force Personnel, including members of the Air National Guard in Title 10 status. AFI 36-2907 at 1. Relevant here, AFI 39-2907 ¶ 4.1 defines who can issue reprimands and other administrative actions. Paragraph 4.1 specifies that "[c]ommanders, supervisors, and other persons in authority can issue administrative counseling, admonitions, and reprimands." Paragraph 4.1.3 further states that commanders should use the preponderance of the evidence standard when evaluating alleged offenses and that "[t]here is no requirement to prove any allegation beyond a reasonable doubt."

2. <u>Standards for Unprofessional Relationships</u>

AFI 1-1 and AFI 36-2909 govern relationships between Air Force personnel. AFI 1-1 states that "[t]he importance of the Air Force's mission and inherent responsibility to the Nation requires its Airmen to adhere to higher standards than those expected outside of Military Service." AFI 1-1 at 1. It further explains that "[t]he Air Force environment, whether at home station or

---

[3] At the time of the conduct at issue, DAFMAN 1-101 was not yet published, and there was no Air Force instruction prescribing a formal CDI process. However, CDI guidance was provided in the SAF/IGQ Commander Directed Investigation Guide (Feb. 18, 2016), https://www.kansastag.gov/DocumentCenter/View/797/Commander-Directed-Investigation-CDI-Guide-PDF, which outlined CDI authority and procedures. The 2016 CDI Guide contained the same standard of proof and guidance for assessing evidence. *Id.* ¶ 1.4.

forward deployed, encompasses the actions, values and standards Airmen live by each and every day, whether on or off duty." *Id.* ¶ 1.1. Beyond this overview, ¶ 2.2.3 provides that "[u]nprofessional relationships can exist between officers, between enlisted members, between officers and enlisted members, and between military personnel and civilian employees or contractor personnel."

AFI 36-2909 specifically governs relationships between Air Force personnel. It mirrors the policy of AFI 1-1, stating:

> While personal relationships between Air Force members are normally matters of individual choice and judgment, they become matters of official concern when they adversely affect or have the reasonable potential to adversely affect the Air Force by eroding morale, good order, discipline, respect for authority, unit cohesion or mission accomplishment.

AFI 36-2909 ¶ 1. The instruction then addresses in more detail how the Air Force defines professional versus unprofessional relationships, explaining that "[p]rofessional relationships are those that contribute to the effective operation of the Air Force," *id.* ¶ 2.1, while "[r]elationships are unprofessional, whether pursued on or off duty, when they detract from the authority of superiors or result in, or reasonably create the appearance of, favoritism, misuse of office or position, or the abandonment of organizational goals for personal interests," *id.* ¶ 2.2. The instruction further confirms that "[u]nprofessional relationships can exist between officers, between enlisted members, between officers and enlisted members, and between military personnel and civilian employees or contractor personnel." *Id.*

Fraternization is a type of unprofessional relationship. *Id.* AFI 36-2909 defines fraternization as "a personal relationship between an officer and an enlisted member that violates the bounds of acceptable behavior in the Air Force and prejudices good order and discipline, discredits the armed services, or operates to the personal disgrace or dishonor of the officer involved." *Id.* ¶ 2.2.1. The instruction describes the custom as "recogniz[ing] that officers will

not form personal relationships with enlisted members on terms of military equality, whether on or off-duty." *Id.* AFI 36-2909 ¶ 2.2.1 cites the Manual for Courts-Martial for a discussion of fraternization. *Id.* That authority lists the following elements of the offense:

> (1) That the accused was a commissioned or warrant officer;
> (2) That the accused fraternized on terms of military equality with one or more certain enlisted members in a certain manner;
> (3) That the accused then knew the person(s) to be (an) enlisted member(s);
> (4) That such fraternization violated the custom of the accused's service that officers shall not fraternize with enlisted members on terms of military equality; and
> (5) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

MANUAL FOR COURTS-MARTIAL, UNITED STATES pt. IV, ¶ 83(b) (1998). The manual further explains that "[n]ot all contact or association between officers and enlisted persons is an offense. Whether the contact or association in question is an offense depends on the surrounding circumstances." *Id.* ¶ 83(c)(1) (explaining factors to be considered, including "whether the conduct has compromised the chain of command, resulted in the appearance of partiality, or otherwise undermined good order, discipline, authority or morale"). "The acts and circumstances must be such as to lead a reasonable person experienced in the problems of military leadership to conclude that the good order and discipline of the armed forces has been prejudiced by their tendency to compromise the respect of enlisted persons for the professionalism, integrity, and obligations of an officer." *Id.*

## II. LEGAL STANDARDS

### A. Motions for Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC") governs motions for judgment on the administrative record. Deciding such motions compares to an "expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir.

2005). In contrast to the standard for summary judgment, "the standard for judgment on the administrative record is narrower" and involves determining, "given all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the burden of proof to show that the [challenged action or] decision was not in accordance with the law." *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*, 404 F.3d at 1357). Therefore, a genuine dispute of material fact does not prevent the Court from granting a motion for judgment on the administrative record. *See Bannum*, 404 F.3d at 1357; *Martinez*, 77 Fed. Cl. at 324.

### B. Standard of Review in Military Pay Cases

In military pay cases, the scope of judicial review is deferential and is limited to determining whether an action or decision by the military was "arbitrary, capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law." *Doe v. United States*, 132 F.3d 1430, 1434 (Fed. Cir. 1997) (quoting *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983)); *see Martinez v. United States*, 333 F.3d 1295, 1314 (Fed. Cir. 2003) (noting that arbitrary-and-capricious review is applied in suits challenging underlying discharge actions as well as the decisions of military correction boards). The Court's review is limited to the administrative record. *Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006). Therefore, the record must contain evidence of legal error or deficiency in the decision-making process meriting judicial relief and "overcom[ing] the strong, but rebuttable, presumption that the administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Doe*, 132 F.3d at 1434 (quoting *Sanders v. United States*, 594 F.2d 804, 813 (Ct. Cl. 1979)). The burden is on the plaintiff to prove such error through "cogent and clearly convincing evidence." *Wronke v. Marsh*, 787 F.2d 1569, 1576 (Fed. Cir. 1986) (quoting *Dorl v. United States*, 200 Ct. Cl. 626, 633 (1973), *cert. denied*, 414 U.S. 1032 (1973)).

Beyond the presumption that military administrators lawfully discharge their duties, "[j]udicial deference must be 'at its apogee' in matters pertaining to the military and national defense." *Voge v. United States*, 844 F.2d 776, 779 (Fed. Cir. 1988) (quoting *Rostker v. Goldberg*, 453 U.S. 57, 70 (1981)); *see Murphy v. United States*, 993 F.2d 871, 872 (Fed. Cir. 1993) ("Justiciability is a particularly apt inquiry when one seeks review of military activities."). Nevertheless, not every claim arising from a military decision is beyond judicial review. *Adkins v. United States*, 68 F.3d 1317, 1323 (Fed. Cir. 1995). Even where Congress provides unlimited discretion, the military is "bound to follow its own procedural regulations if it chooses to implement some." *Murphy*, 993 F.2d at 873 (citing *Sargisson v. United States*, 913 F.2d 918, 921 (Fed. Cir. 1990)); *see also Fisher v. United States*, 402 F.3d 1167, 1177 (Fed. Cir. 2005); *Voge*, 844 F.2d at 779 ("[T]he Claims Court may review the [challenged decision] process for compliance with established procedures."). Accordingly, where procedural violations are alleged, "this [C]ourt does not improperly exercise any discretion reserved for the military" but rather determines only whether the challenged action violated applicable statutory and regulatory standards. *Adkins*, 68 F.3d at 1323.

## III. DISCUSSION

### A. The Court Reviews the Board's Remand Decision Under a Deferential Standard.

The parties dispute what the Court's scope of review should encompass in this case. Plaintiff urges that the Court review not only the Board's decision denying him relief on remand,[4] but also the underlying CDIs, LORs, OPR, and curtailment decision. *See* ECF No. 31 at 20–31. He argues that his challenges to these underlying decisions are justiciable because the decisions

[4] At oral argument, Plaintiff clarified that he is not challenging the Board's first denial decision. *See* Oral Arg. Tr. at 15:7–12, ECF No. 45. Plaintiff only challenges the Board's remand decision and "the actions of the Command that led to [it]." *Id.*

involve procedural violations that ultimately led to his curtailment. *Id.* at 19. The Government, on the other hand, argues that the Court's review is limited to the Board's decision to which it must apply a deferential standard of review. *See* ECF No. 34 at 19–28. The Government is correct.

As a general matter, the Court agrees that Plaintiff's claim is justiciable. A case is justiciable when "'tests and standards' exist against which a court can measure the challenged action." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002) (citing *Voge*, 844 F.2d at 780). Although the merits of military decisions, including fitness to serve, are often nonjusticiable, "a court may decide whether the military has complied with procedures set forth in its own regulations because those procedures by their nature limit the military's discretion." *Fisher*, 402 F.3d at 1177.

Here, the Air Force has provided standards of conduct regarding fraternization and unprofessional relationships, as well as procedures governing CDIs and disciplinary actions. *See* DAFMAN 1-101; AFI 1-1; AFI 36-2907; AFI 36-2909; *see also Adkins*, 68 F.3d at 1323 ("In cases in which procedural violations are alleged, the test or standards against which this court measures the military's conduct are inherent: they are the applicable statutes and regulations." (citing *Murphy*, 993 F.2d at 873)).

Where Plaintiff's argument begins to fray is in his attempt to distort the Court's standard of review by suggesting that the Court should directly review the underlying CDIs, LORs, OPR, and curtailment decision. *See* ECF No. 31 at 18–20. Plaintiff repeatedly takes issue with the findings in both CDIs and argues that the Court should rule in his favor because those findings were not sufficiently supported by preponderant evidence in the record. *See, e.g.*, *id.* at 22–24 (arguing that the first CDI was not supported by a preponderance of the evidence); *id.* at 26–29 (arguing that the second CDI was also unsupported and disagreeing with the IO's characterization

of the video). He asserts that because the IO's underlying findings were erroneous, so too were the resulting LORs, OPR, curtailment decision, and the Board's decision. *Id.* at 29–30.

The Court's duty, however, is to determine if the Board's decision was arbitrary and capricious and if "substantial evidence supports [the] [B]oard's action." *Bailey v. United States*, 145 Fed. Cl. 453, 460 (2019) (holding that a court will sustain the board when its "[decision] is reasonable given the evidence presented"). "Substantial evidence, though less than a preponderance, is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *La. Pub. Serv. Comm'n v. FERC*, 20 F.4th 1, 7 (D.C. Cir. 2021) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938)). To be sure, this deferential standard of review allows the Court to consider the factual underpinnings of the Board's decision (*i.e.*, the military actions challenged before the Board), but it is doing so to determine whether the Board's decision—"the conclusion being reviewed" here—is rationally explained and "supported by substantial evidence." *Heisig*, 719 F.2d at 1157.

One court has described "the layers of review" in military record correction cases as "onion-like." *Dorado-Ocasio v. Averill*, 128 F.4th 513, 523 (4th Cir. 2025). In *Dorado-Ocasio*, the plaintiff's evaluation report was subject to review by a senior rater, then a Commander, then the Army Soldier Records Branch, and finally the Army Board for Correction of Military Records ("ABCMR") prior to review by the district court, which upheld the ABCMR's decision to deny his application for correction of records. *Ocasio-Dorado v. Wormuth*, No. 123CV595PTGIDD, 2024 WL 712533, at *9 (E.D. Va. Feb. 21, 2024), *aff'd sub nom. Dorado-Ocasio*, 128 F.4th 513. The district court reasoned—and the Fourth Circuit agreed—that *the ABCMR* had adequately explained its decision to deny the plaintiff's application by detailing the key factual findings in the

record and considering the plaintiff's arguments. *Id.* That is the appropriate scope of judicial review.

Plaintiff's request that the Court re-evaluate the CDIs, LORs, OPR, and curtailment decision, rather than focus on the Board's decision, seems to confuse the question of justiciability with the question of the correct standard of review. Justiciability is a threshold question: can the Court hear the case? *Fisher*, 402 F.3d at 1176. Evaluating the appropriate standard of review presumes justiciability: given that the Court can hear the case, what standard should it apply? Plaintiff's misstep seems to be explained by his misreading of *Adkins*. *See* ECF No. 31 at 19. As Plaintiff sees it, under *Adkins*, all of Plaintiff's evidentiary challenges to the CDIs and LORs should be considered because they address procedural violations. *Id.* The Federal Circuit's decision in *Adkins* held that "[a]lthough the *merits* of a decision committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular *procedure* followed in rendering a military decision may present a justiciable controversy." 68 F.3d at 1323. Specifically, in cases challenging the military's determination of who should serve (and in what capacity), courts should avoid judging the merits of that determination and only consider whether the correct procedures were followed in arriving at it.[5] *Loomis v. United States*, 68 Fed. Cl. 503, 508 (2005) (citing *Adkins*, 68 F.3d at 1323).

While the Court agrees with Plaintiff that it can review this case under *Adkins*, that does not change the fundamental conclusion that the decision the Court is reviewing is *the Board's*

[5] The *Adkins* standard contrasts with how courts approach cases challenging the military's denial of benefits, where courts are permitted to examine the merits of an agency's decision. *Loomis*, 68 Fed. Cl. at 508. The present case falls into the first category: the curtailment decision was a determination about whether Plaintiff should continue serving on his AGR tour. AR 234. Although the curtailment decision resulted in the loss of benefits Plaintiff would have received if his tour had not been curtailed, the decision itself was not a denial of benefits decision.

decision. Plaintiff's argument in essence asks the Court to impermissibly conduct a de novo review of the facts and serve as a "super correction board." *Van Cleave v. United States*, 70 Fed. Cl. 674, 678 (2006). As the Government correctly observes, the Court is not permitted to reweigh the facts relevant to the underlying military decisions.[6] *Heisig*, 719 F.2d at 1157; Oral Arg. Tr. at 42:6–25, ECF No. 45 ("So to the extent that the Plaintiff is requesting that the Court review the initial findings of the two CDIs, then that's not justiciable in this Court.").

Plaintiff alternatively asserts that *Adkins* should not apply to this case because Plaintiff is challenging the existence of military misconduct in the first place. *See* ECF No. 31 at 20. In other words, because he claims there was no evidence to support the investigative findings that formed the basis for his LORs, referred OPR, and curtailment, the Court should create a "carveout" from *Adkins*. ECF No. 45 at 9:22–10:8 (arguing that courts are "well equipped" to determine whether a member of the military has committed misconduct). This alternative argument seems to concede that at least part of his challenge in this Court is a disagreement with the merits of—rather than the procedures underlying—the adverse military decisions at issue. *Id.* Regardless, such a rule has no basis in law.

Plaintiff cites *Loomis v. United States*, 68 Fed. Cl. 503, 514 (2005), and *Waters v. United States*, 139 Fed. Cl. 9, 22 (2018), to support his contention that "judging the existence and the evidentiary support for military misconduct is very much the business of courts." ECF No. 31 at 20. But in *Loomis*, the court applied the substantial evidence standard to review the board's

[6] Plaintiff insists that he is not asking the Court to reweigh the evidence because, in his words, "there is nothing to weigh." ECF No. 45 at 11:9–16. In Plaintiff's view, because the evidence supporting the investigative findings did not meet the Air Force's standards for unprofessional relationships, there is no evidence supporting the LORs. As discussed below, asking the Court to assign a weight of zero to the evidence is still a form of reweighing evidence, which is something the Court cannot do. *Heisig*, 719 F.2d at 1157.

decision. *See* 68 Fed. Cl. at 513–14 (considering "*the ABCMR's* determination that the alternative ground of conduct unbecoming an officer justified plaintiff's elimination" (emphasis added)). *Waters* likewise applied that standard, and the discussion in *Waters* cited by Plaintiff pertained to a procedural challenge—not one contesting the sufficiency of the evidence. 139 Fed. Cl. at 19; *see also id.* at 22 (considering whether the Navy violated procedures by not giving plaintiff "the opportunity to review and comment on . . . 'new factual material'"). In neither case did the court announce—or apply without announcing—a different standard of review because the cases involved military misconduct.

In sum, the Court's duty is to assess whether the Board's decision is reasonable and supported by substantial evidence, meaning that which "a reasonable mind might accept as adequate to support a conclusion." *La. Pub. Serv. Comm'n*, 20 F.4th at 7. The Court thus proceeds in applying that standard to Plaintiff's challenges to the Board's decision.

**B. The Board's Remand Decision Is Reasonable and Supported by Substantial Evidence.**

1. <u>The Board's Determination That the D.C. ANG Did Not Err in Issuing the First LOR Is Reasonable and Supported by Substantial Evidence.</u>

Substantial evidence supports the Board's reasonable determination that there was no error or injustice in the D.C. ANG issuing Plaintiff the first LOR based on the findings of the May 2017 CDI. Plaintiff does not meet his heavy burden to show that the Board's decision was irrational or unsupported by substantial evidence.

In its remand decision, the Board disagreed with Plaintiff's contention that the IO assigned to Plaintiff's first CDI imposed his own religious and sexual values, rather than the Air Force standards, in determining that the evidence substantiated an unprofessional relationship between Plaintiff and Major A.M. AR 239. The Board found that the IO properly applied AFI 36-2909, and that DAFMAN 1-101 permitted him to assess the evidence gathered using his "own common

sense, life experiences and knowledge of the ways of the world." AR 240. While Plaintiff may identify as an atheist who is "not bound to traditional values," the Board correctly found that he was nonetheless required to follow Air Force regulations regarding professional relationships. *Id.* And despite his attempts to discredit the IO, the Board reasonably found that Plaintiff did not meet his burden to show that the IO applied any standard defining unprofessional relationships other than the one found in the applicable AFI. *Id.*

The Board also performed an independent review of the May 2017 CDI. *Id.* Emphasizing that the standard of proof for a CDI is the preponderance of the evidence, the Board concluded that the first LOR was based on substantiated findings and aligned with the evidence. *Id.* (holding there was "no evidence the applicant was issued the LORs contrary to the evidence"). In support of its finding, the Board pointed to "multiple witness testimonies pertaining to the applicant's unprofessional relationship with [Major A.M.]," "which affirm the veracity of the substantiated allegations" in the CDI. *Id.*

Substantial evidence in the record confirms the Board's conclusions. According to the IO's report, two witnesses—identified as Lt Col WITNESS5 and Maj WITNESS7[7]—testified to observing situations that indicated an inappropriate relationship between Plaintiff and Major A.M.[8] AR 278–79. This included observing Plaintiff spending a noticeable amount of time with Major

[7] Plaintiff represents that Maj WITNESS7 is Maj Paul Doughty, who was also involved in the investigation of the fraternization allegation. *See* ECF No. 31 at 6 n.6.

[8] Plaintiff challenges the Board's emphasis on the multiple witnesses relied on in the CDI. *See* ECF No. 35 at 14. The Court agrees that the number of witnesses interviewed by the IO does not itself satisfy the substantial evidence standard; however, the Board's findings were not solely focused on numbers. The Board found that "multiple witness testimonies" in the IO's report detailed the unprofessional relationship between Plaintiff and Major A.M. and "affirm[ed] the veracity of the substantiated allegations." AR 240. That conclusion is both reasonable and supported by the record.

A.M., including the two arriving to and leaving from work in the same vehicle, frequently eating meals together, and consistently riding in the same elevator car. AR 278. When Plaintiff's wife visited Guam, she was reported to be "visibly upset any time she was around" Plaintiff and Major A.M. *Id*. One of the witnesses, Maj WITNESS7, confronted Major A.M. about "the appearance that their actions were creating" and "how rumors were rampant that they were engaged in an inappropriate relationship." *Id.* Lt Col WITNESS5, the deployment's Deputy Commander, also took notice and, although he did not directly order them to avoid contact with each other, he told Plaintiff and Major A.M. to "'knock off' any behavior that might be perceived by others to show a relationship." AR 280.

While the IO could not identify a "'[s]moking [g]un' in the evidence collected," he made a judgment, based on the totality of the evidence, that the existence of an unprofessional relationship was more probable than not. AR 283. Citing AFI 36-2909, the IO also specifically found that Plaintiff and Major A.M.'s conduct, especially their disregard of the Deputy Commander's warning to knock it off, "demonstrated their inattention (at a minimum) to good order and discipline," and fueled rumors in the unit that "further erod[ed] good order and discipline." *Id.*

Plaintiff's primary argument is that the IO vaguely determined that his relationship with Major A.M. was "inappropriate" without ever saying what was inappropriate about it. *See* ECF No. 31 at 23–24. According to Plaintiff, "inappropriate" implies that he and Major A.M. "created the appearance that they were *having sexual intercourse*." *Id.* at 23 (emphasis in original). Even assuming they were engaging in sexual relations, Plaintiff notes that such conduct is not forbidden by AFI 36-2909. *Id.* While the latter legal statement is true (sexual relationships between officers are not per se prohibited), the IO was not required to find that Plaintiff engaged in a specific type

of behavior or interacted with Major A.M. in a particular way to find that their relationship met the definition of an unprofessional relationship. Rather, the Air Force standard focuses on the impact or result of the personal relationship, not the actual behavior. *See* AFI 36-2909 at 1 ("Unprofessional relationships are those interpersonal relationships that erode good order, discipline, respect for authority, unit cohesion and, ultimately, mission accomplishment."); *id.* ¶ 1 (explaining that "personal relationships between Air Force members . . . become matters of official concern" when they result in, or have the reasonable potential to result in, adverse effects "on the interests of the Air Force as an institution"); *id.* at ¶ 2.2 (providing that a relationship is unprofessional if it "result[s] in, or reasonably create[s] the appearance of favoritism, misuse of office or position, or the abandonment of organizational goals for personal interests").

As the IO explained, it was Plaintiff's and Major A.M.'s disregard for their superior's warning and the adverse effect on their unit that made their relationship cross the line into unprofessional territory. *See* AR 283 (explaining adverse effect findings under AFI 36-2909). Even Plaintiff acknowledges "the rumored or suspected relations between Mr. Torrence and A.M.," ECF No. 35 at 14, and this was exactly the IO's point—whether a sexual relationship was actually established did not matter to substantiate the existence of an unprofessional relationship. The Board likewise assessed Plaintiff's claims against the same standard. *See* AR 238 (quoting unprofessional relationship definition in AFI 36-2909), 239 (noting adverse effect language in AFI 36-2909).[9] Its conclusion that the IO applied the right standard was both reasonable and supported by the evidence.

---

[9] It appears that the Board quoted the definition of "Unprofessional relationships" from the version of AFI 36-2909 published on November 14, 2019. Although the more recent version includes additional detail, the differences in the definitions provided in the 1999 and 2019 versions are immaterial to this case.

In a related argument, Plaintiff contends that the IO further misapplied the standard for unprofessional relationships because he determined Plaintiff's relationship with Major A.M. was "inappropriate" based on the "personal moral or religious opinions" of himself and Plaintiff's unit members, which "cannot justify adverse actions that deprive an officer of pay." ECF No. 31 at 24. This assertion also fails to persuade.

The Board reasonably rejected Plaintiff's contention that the IO used religious and moral standards to determine whether Plaintiff's relationship with Major A.M. was unprofessional under AFI 36-2909,[10] finding that there was "no evidence" the IO applied any other standards than the Air Force regulations. AR 240. As the Board correctly noted, regardless of Plaintiff's own religious or moral beliefs, he was "required to adhere to military standards . . . although he may not personally agree with the standards." *Id.* Moreover, the Board correctly cited DAFMAN 1-101 as permitting the IO to rely on his "own common sense, life experiences and knowledge of the ways of the world" to assess the evidence. *Id.* Rather than pointing out an error by the Board, Plaintiff's arguments, at their core, amount to no more than disagreements with the IO's application of the Air Force standard in his case. Substantial evidence, however, supports the Board's decision that the IO did not apply an impermissible standard, considering the evidence that Plaintiff's relationship with Major A.M. was flagged by their superior as creating the appearance of an unprofessional relationship, stoked rumors in the unit, and, as a result, negatively impacted good order and discipline. *Id.*

In sum, the Board reasonably determined that there was no error or injustice in the D.C. ANG issuing Plaintiff the first LOR. Since Plaintiff fails to provide "cogent and clearly convincing

[10] Plaintiff does not challenge AFI 36-2909 as being vague. *See* ECF No. 45 at 12:8–13 ("[T]he regulation, although it's broad, is [] valid"). Instead, he challenges how the IO applied the instruction to his case.

evidence," *Wronke*, 787 F.2d at 1576, that the Board's decision was unsupported by substantial evidence, the Board's decision regarding the first LOR must stand.

2. The Board's Determination That the D.C. ANG Did Not Err in Issuing the Second LOR Is Reasonable and Supported by Substantial Evidence.

Substantial evidence also supports the Board's determination that the there was no error or injustice in the D.C. ANG issuing Plaintiff the second LOR based on the findings of the January 2019 CDI. Plaintiff argues that the IO's findings were contrary to the evidence. *See* ECF No. 31 at 28. In his view, what occurred in the hotel bar between him and the enlisted woman—as depicted in the video and photographs—was not unacceptable behavior, and even if it was, it could not have met the standard for fraternization because there was no evidence that he knew that the woman was enlisted. *See id.* Plaintiff further contends that the IO failed to provide evidence that he made false statements about the events of the night of October 16, 2017. *See id.* at 29. These arguments fail to carry Plaintiff's burden.

The Board disagreed with Plaintiff's contention that the video and photographs "invalidate[d] certain findings" against him, nor did it agree with Plaintiff's assessment of such evidence. AR 239. Based on its independent review, the Board found that the video showed Plaintiff was "in very close contact" with the enlisted woman "for an extended period of time," with "her back [] pressed against him." *Id.* It further observed that Plaintiff's "right hand is on her hip and at times her head appears to be leaning back on his shoulder." *Id.* The Board also observed that "the bar does not appear to be so busy that people are unable to pass by," which was one of Plaintiff's defenses for his close contact with the woman. *Id.* Responding to Plaintiff's claimed lack of knowledge, the Board found that the video and photographs showed that Plaintiff and the enlisted woman were apparently acquainted, noting also that they were "both attending the same event at the hotel." *Id.* Finally, the Board found Plaintiff's contention that his behavior was

not "lude" to be immaterial. *Id.* As the Board correctly stated, the standard for fraternization in AFI 36-2909 does not require a finding of lewdness. *Id.*; *see also* AR 238 (summarizing definition of fraternization).[11]

This Court has likewise independently reviewed the video and photographs and concludes that the evidence substantially supports the Board's findings. Contrary to Plaintiff's account, and consistent with the Board's assessment, the video shows Plaintiff was conversing with and sitting closely next to the enlisted woman at the bar for well over an hour, during which they often leaned in to speak into the other's ear. Sometimes they were conversing alone, sometimes they were joined by others at the bar, including other uniformed ANG members. At one point, Plaintiff appeared to try on her sunglasses (Video pt. 1 at 44:20–45:20), and they leaned in close to view items in the enlisted woman's bag (Video pt. 1 at 1:00:19–1:01:53) as well as something on Plaintiff's phone (Video pt. 1 at 59:22–53). After briefly stepping away, the enlisted woman returned and positioned herself closely in front of Plaintiff, facing away from him (Video pt. 1 at 59:00). At the time that the photographs were taken (Video pt. 2 at 8:58), Plaintiff and the enlisted woman were in roughly the same position, with their bodies touching. As the Board correctly noted, at times she appeared to lean her head back on Plaintiff's shoulder (*e.g.*, Video pt. 2 at 7:32). The photographs in the record further confirm their close stance, showing that the woman was standing between Plaintiff's legs as he sat on a barstool. From this evidence, the Board rationally concluded that Plaintiff failed to compellingly rebut the IO's finding of fraternization.

[11] As noted above, *supra* note 9, the Board quoted a more recent version of AFI 36-2909, which moved the definition of "Fraternization" to a separate chapter and provided additional detail, including additional explanation of the offense from the Manual for Courts-Martial. Again, the differences in the definitions provided in the 1999 and 2019 versions are immaterial to this case.

Plaintiff's first line of attack largely identifies immaterial errors in the IO's report or merely disagrees with the IO's assessment of the video and photographs. *See* ECF No. 31 at 28. For example, he contests the IO's finding that the video and photographs show Plaintiff's "hands around the female's waist," AR 111, noting that the evidence shows he only had one hand around her waist. *See* ECF No. 31 at 28. The Court agrees that the evidence shows he only had his right hand on the woman's waist, and the Board likewise correctly noted that fact. AR 239 (observing that "his right hand is on her right hip"). But whether he had one or both hands on the enlisted woman does not negate the remainder of the circumstances depicted in the video and photographs on which the IO based the overall finding of fraternization.

Similarly, Plaintiff is also correct that the IO recorded the wrong times covering the period of Plaintiff's very close contact with the enlisted woman. *See* ECF No. 31 at 28; *see also* AR 111 ("The video shows from 2345 Lt Col Torrence and a female in very close contact with continued contact until 0010."). The entire period they were together was from roughly 22:15 until 23:25 (on the wall clock), with the last 15 minutes or so being the most relevant. The point the IO was attempting to make, however, was that the video contradicted Plaintiff's story that the photographs caught him in an innocent moment when he was trying to get around the woman to go to the bathroom. *Id.* The Board reasonably rejected that story as contrary to the video evidence. *See* AR 239 (observing that "the bar does not appear to be so busy that people are unable to pass by").

Other contentions by Plaintiff, like how briefly he was in contact with the woman or how they were just socializing,[12] are simply disagreements with the IO's assessment of the evidence.

[12] This argument also demonstrates Plaintiff's disagreement with the Air Force's standard regarding unprofessional relationships. As the Board correctly explained, "[w]hile the applicant claims his behavior was not lude [sic], this is not the standard to find a relationship is unprofessional." AR 239. For purposes of the substantiated fraternization finding, it was not that Plaintiff's interaction with the enlisted woman was lewd, but rather that it prejudiced good order

*See* ECF No. 31 at 28. Indeed, some of Plaintiff's contentions—like his "wingman" argument, *id.* at 30–31, and reference to the enlisted woman's statement that "nothing too out of the ordinary" happened on the evening in question, *id.* at 28 (quoting AR 106)—essentially ask the Court to reweigh the evidence, which the Court is not permitted to do. *See Heisig*, 719 F.2d at 1157.

Plaintiff's second line of attack, which challenges the knowledge element of the fraternization finding, also misses the mark. Plaintiff asserts that because the IO did not cite direct evidence that Plaintiff knew the woman at the bar was enlisted, the conclusion that he fraternized with her is unsupportable. *See* ECF No. 31 at 28. While the offense of fraternization requires that Plaintiff had knowledge that the woman was enlisted, Plaintiff misinterprets the evidentiary standard. The standard of proof for a CDI and for issuing a LOR is a preponderance of the evidence, which "means simply the greater weight of credible evidence." AFI 36-2907 ¶ 4.1.3; *see* DAFMAN 1-101 ¶ 1.4 (defining the standard as "the greater weight of credible evidence"). Under that standard, the factfinder must determine the credibility and weight of the evidence and the probability or improbability of the alleged events based on the credible evidence. *See* DAFMAN 1-101 ¶ 1.4. The IO did just that: she found that it was more likely than not that Plaintiff knew of the woman's enlisted status based on the evidence, including the testimony of a fellow officer attending the conference who stated that "anyone would know that the women at the bar were the enlisted services women working refreshments at WEPTAC."[13] AR 345 (further stating that "anyone with observation skills would put 2 and 2 together").

---

and discipline by putting the enlisted woman "on terms of military equality" with Plaintiff, who is an officer. AFI 36-2909 ¶ 2.2.1. The video and photographic evidence substantially supports the Board's finding that there was no error or injustice in the IO finding that the extended close contact and interactions between Plaintiff and the enlisted woman constituted fraternization.

[13] According to Plaintiff, this statement was provided by Maj Robert Bielanski, who was at the bar and appears in the video. *See* ECF No. 31 at 28 n.23. Maj Doughty was also at the bar

The Board found no error or injustice in the IO's finding, concluding that the video and photographs indicated that Plaintiff and the enlisted woman appeared to be "acquainted" and also noting that "[t]hey were [] both attending the same event at the hotel." AR 239. That this conclusion was based on circumstantial, not direct, evidence is inconsequential. *See Donoghue v. U.S. Postal Serv.*, 167 F. App'x 172, 175 (Fed. Cir. 2006). The Federal Circuit has rejected the idea that circumstantial evidence is "second-class to direct evidence." *Medtronic, Inc., v. Teleflex Innovations S.a.r.l.*, 70 F.4th 1331, 1340 (Fed. Cir. 2023) ("Circumstantial evidence is just that—evidence. It establishes that a given fact is more likely to be true than one would otherwise believe in the absence of the evidence."). The circumstantial evidence here substantially supports the Board's finding on knowledge. Specifically, Plaintiff and the enlisted woman conversed for over an hour at the bar of the hotel where they were both attending a military conference. Although she was in civilian clothes, Plaintiff was in uniform. The two were also joined at various times by other ANG members in uniform, including at least two officers known to Plaintiff. One of those officers reported that he recognized the enlisted woman as part of the WEPTAC services team. *See* AR 344–45. According to the witness, the women worked in uniform during the conference providing refreshments to the attendees and hung out at the bar afterward. *See id.*

The IO was not required to prove to a high level of certainty that Plaintiff knew of the enlisted woman's status, and "[t]he fact that some of the evidence cited by the plaintiff could conceivably support a different conclusion is immaterial." *Myers v. United States*, 50 Fed. Cl. 674, 696 (2001). Accordingly, the Board reasonably concluded, as supported by substantial evidence, that there was no error or injustice regarding the IO's finding that Plaintiff more likely

---

that night and took the photographs of Plaintiff and the enlisted woman. *See id.* at 10; *see also* ECF No. 41-1 at 1–2 (unredacted excerpt of report).

than not had knowledge of the woman's enlisted status. The Court will not disturb the Board's conclusion absent "cogent and clearly convincing evidence" that it erred. *Wronke*, 787 F.2d at 1576. Plaintiff has not met this burden.

Plaintiff's third and final challenge to the second LOR contests both the lack of evidentiary support and lack of an articulable explanation for the IO's finding that Plaintiff made false statements in violation of Air Force standards. This challenge also fails. The IO's report stated that several of Plaintiff's statements were not "supported by the video." AR 350. This includes his claims that "the female at the bar fell into his crotch," that she "straddled him," that she was "up against him because the bar [was] jammed and [he] ha[d] to move one leg around her at a time to get faced away from the bar," and that finally "he pushed her away." *Id.*; *see* AR 347–50 (providing a more detailed summary of numerous statements by Plaintiff).

Plaintiff contends that because the IO was "unable to say *which* statements were supposedly false," the IO's finding that Plaintiff made false statements cannot stand. ECF No. 31 at 29 (citing AR 111). This argument mischaracterizes the IO's report. What the IO stated was that she could not "confirm exactly what was said on the evening of 16 Oct 17 to current witness statements." AR 350. Although the IO's statement is somewhat unclear, the IO was likely acknowledging that certain witnesses reported on past conversations with Plaintiff, the accuracy of which the IO could not confirm. *See* AR 347–348 (reports of telephone calls and texts between witnesses and Plaintiff shortly after event). More significantly, however, Plaintiff cherry-picks this quote out of a lengthier explanation that supports the IO's false statement finding. As she explained, after an extensive investigation, the IO found she had sufficient evidence to demonstrate that Plaintiff made false statements due to "inconsistencies" between the witness statements, Plaintiff's sworn statement submitted to his lawyer, the Memorandum for Record that Plaintiff

submitted, and the video evidence. In other words, the IO found that Plaintiff's story, as reported through various sources, did not match up with the video evidence.

As noted above, the Board likewise found that the video undermined Plaintiff's version of events, as reported by several witnesses. *See* AR 239 (observing that "the bar does not appear to be so busy" and that "[the enlisted woman's] back is pressed against [Plaintiff], his right hand is on her right hip and at times her head appears to be leaning back on his shoulder"). The Court finds this conclusion was supported by substantial evidence. The video does not show that the bar was so crowded that it could be said to have been "jammed," nor does it show Plaintiff pushing the woman away, as he suggested, or attempting to get around the woman to leave the bar when the photographs were taken. AR 348. The video instead shows the two of them in intentionally very close contact for an extended period of time. Thus, although Plaintiff attempted to explain away the photographs as a single inopportune moment where he happened to be in close contact with the woman, this account was false based on the video evidence.

In the end, Plaintiff's challenge to the IO's false-statements finding fails for the same reason that his challenge to the fraternization finding fails: Plaintiff simply disagrees with the IO's account of what occurred on the night of October 16, 2017. Plaintiff insists that his account could not have been false because the IO and the Board misinterpreted the evidence. But, as the Court has already discussed, the Board's remand decision comports with the video and the photographs. The decision is, therefore, supported by substantial evidence.

**C. Colonel Vargas Had Authority to Reprimand Plaintiff.**

Plaintiff argues that Colonel Vargas, as the D.C. ANG Commander, lacked the authority to issue Plaintiff's first LOR because Plaintiff was serving in Title 10 status, not Title 32 status, during his deployment in Guam when his unprofessional relationship with Major A.M. occurred. *See* ECF No. 31 at 26. The Board rejected this argument, reasoning that "pursuant to the authority

delegated to ANG commanders by the [Secretary of the Air Force], it is permissible to impose administrative disciplinary actions, such as an LOR, if there is a federal nexus between the officer's ANG membership and a violation of law or federal military standards." AR 240. Although the Board's analysis was legally erroneous, the Court agrees that Plaintiff has not shown the first LOR was issued without authority.

The difference between Title 10 and Title 32 status is aptly summarized in *United States v. DiMuccio*, 61 M.J. 588, 589 (A.F. Ct. Crim. App. 2005):

> While serving in the state militia, Air National Guardsmen are often said to be serving in "Title 32 status," a shorthand reference to their federally-funded state training status under Title 32 of the United States Code. ANG members ordered to active duty enter federal service as part of the [Air National Guard of the United States] and are subject to the laws and regulations governing the United States Air Force. 10 U.S.C. § 12405. When activated, ANG members are said to be serving in "Title 10 status," that is, federal active duty status, distinct from their state militia role.

The Board found that Colonel Vargas had authority to issue Plaintiff's first LOR even though Plaintiff was in Title 10 status when he served in Guam. AR 237. In its decision, the Board cited as applicable authority a 2014 Judge Advocate General ("JAG") Opinion, reciting the following:

> The [Secretary of the Air Force]'s authority to take appropriate administrative action against ANG officer personnel to ensure consistency does not deprive the Governor/[the Adjutant General] of their own administrative authority and responsibility over ANG officers and their conduct. There is no "double jeopardy" prohibition to administrative dispositions from both chains of command/lines of authority as one is federal and the other is state. Consequently, an ANG officer may be issued an LOR, LOA [Letter of Admonishment], or LOC [Letter of Counseling] by the [Secretary of the Air Force]'s delegated authority and the governor for the same conduct. In conclusion, pursuant to the authority delegated to the ANG commander by the [Secretary of the Air Force], it is permissible to impose administrative disciplinary actions if there is a federal nexus between the officer's ANG membership and a violation of law or federal military standards.

AR 237 (citing OpJAGAF 2014-6, *Air National Guard* (Aug. 5, 2014) at 4–5).[14] The cited JAG opinion was issued in response to an inquiry from the Vice Chief of Staff of the Air Force about "whether, and to what extent, [the Vice Chief of Staff] ha[s] the authority to take administrative actions against State adjutants general (TAGs) and other Air National Guard (ANG) general officers." OpJAGAF 2014-6 at 1. After reviewing the federal government's "clear and pervasive connection to, funding of, and authority to establish training and other requirements for federally recognized ANG officers," the opinion concluded that the Secretary of the Air Force ("SECAF") through his delegee may "administratively reprimand ANG general officers regardless of their duty status at the time of the offending conduct," so long as a federal nexus exists. *Id.* at 4. "For purposes of substantiated allegations resulting from a SAF/IG investigation, the federal nexus is established when a federally recognized ANG officer violates federal law or federal military standards." *Id.*

The Board relied on the federal nexus analysis to support Colonel Vargas's authority to reprimand Plaintiff, but that reliance is misplaced. The federal nexus analysis applies where a federal official, *i.e.*, the SECAF or his delegee (the Vice Chief of Staff), seeks to reprimand an ANG general officer, *i.e.*, a member of an organized state militia. *Id.* at 1. But here, there was no attempt by a federal official to extend authority over a state militia member. Rather, Plaintiff was reprimanded by his own ANG commander while he was in Title 32 status. There was no need to look for a federal nexus in this case to assess the ANG commander's authority. Thus, the Board's legal reasoning was flawed.

[14] OpJAGAF 2014-6 is available on the Air Force Judge Advocate's website: https://www.afjag.af.mil/Library/HQ-JAA/OpJAGAFs-2010-2019/.

Although the general rule is that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based," *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943), that doctrine "does not mean that a reversal and remand are required each and every time an administrative agency assigns a wrong reason for its action," *NLRB v. Am. Geri–Care, Inc.*, 697 F.2d 56, 64 (2d Cir. 1982). *Chenery* applies to "determinations specifically entrusted to an agency's expertise," such as the agency's factual determinations, but not to legal determinations "that a court usually makes." *Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 304 (D.C. Cir. 2015). Accordingly, in reviewing agency decisions, courts are permitted to affirm a legal conclusion on grounds different from those on which the agency relied if the ultimate result is the same. *See Grabis v. OPM*, 424 F.3d 1265, 1270 (Fed. Cir. 2005); *see also Lee v. Kennedy*, 294 F.2d 231, 234 (D.C. Cir. 1961). Whether a Title 32 commander may discipline an ANG officer in Title 32 status for conduct the occurred while the officer was in Title 10 status is a question of law that this Court has the authority to resolve. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024). Because the Board "would have reached the same ultimate result" had it applied a correct reading of the law, the Court may uphold the decision without a remand. *Grabis*, 424 F.3d at 1270.

There is no question that Colonel Vargas, as D.C. ANG Commander, generally had the authority to reprimand Plaintiff while he was in Title 32 status. The Board's remand decision cited AF 36-2907 as the authority for the D.C. ANG's adverse administrative actions against Plaintiff. *See* AR 238; *see also* OpJAGAF 2014-6 at 4 n.29 (citing AFI 36-2907 as the authority relied on in the *Air National Guard Commander's Legal Deskbook* for issuing LORs). Chapter 4 of that instruction provides that "[c]ommanders, supervisors, and other persons in authority can issue administrative counseling, admonitions, and reprimands." AFI 36-2907 ¶ 4.1; *see id.* at 1 ("This

publication applies to all Air Force Personnel including the Regular Air Force (RegAF), the Air Force Reserve (AFR) and the Air National Guard (ANG) on Title 10 status."). Additionally, OpJAGAF 2014-6 recognized that ANG commanders and supervisors have "inherent authority" to issue administrative admonitions and reprimands to ANG members in Title 32 status. OpJAGAF 2014-6 at 4 n.29. Neither the instruction nor that inherent authority limits an ANG commander's disciplinary authority based on the type of duty status the member is in. Nor has Plaintiff identified a separate authority that imposes such a limitation. Although Plaintiff tries to demonstrate that an ANG commander's general authority does not apply when an ANG member is in Title 10 status, the sources he cites fail to demonstrate the inapplicability of this general rule.

Plaintiff relies on a 2019 Air Force JAG opinion, which stated that a Title 10 commander cannot reprimand an ANG member for his actions while the member is in Title 32 status. *See* AR 566–67 (OpJAGAF 2019-21, *Air National Guard* (Apr. 30, 2019)); *see also* AR 567 (recognizing the exception in OpJAGAF 2014-6 for SECAF's broad authority to take administrative action against ANG officers regardless of their status). By logical inference, Plaintiff asserts that the opposite must also be true: that a Title 32 commander cannot reprimand an ANG member for his actions while in Title 10 status. *See* ECF No. 31 at 26. Plaintiff's logic is faulty. Although the 2019 opinion concluded that "[f]ederal authority to exercise discipline over National Guard personnel attaches only when the member is in federal (i.e. Title 10) status," nothing in the opinion suggests that the inverse is also true. In fact, the apparent impetus for the 2019 legal opinion was that a Title 32 commander declined to take administrative action—contrary to the Title 10 commander's request—against ANG members who had committed misconduct while in Title 10 status but who had since *returned to Title 32 status*. *See* AR 566. This factual scenario suggests, at the very least, that the Title 10 commander believed the Title 32 commander properly had

disciplinary authority over the ANG members because of their then-current Title 32 status, notwithstanding that the ANG officers were in Title 10 status at the time of the misconduct.

The 2014 Air Force JAG opinion cited by the Board also suggests that Title 32 commanders have concurrent jurisdiction with the SECAF to discipline ANG officers serving in either Title 32 or Title 10 status. That opinion rejected the idea that there is a "'double jeopardy' prohibition to administrative dispositions from both chains of command/lines of authority [when] one is federal and the other is state." OpJAGAF 2014-6 at 4. As such, "an ANG officer may be issued an LOR . . . both by [the Vice Chief of Staff] (exercising SECAF's delegated authority) and the [ANG chain-of-command] for the same conduct." *Id.* Although the opinion does not explicitly state that Title 32 commanders have authority to issue reprimands to ANG members who committed misconduct in Title 10 status, it does tend to rebut Plaintiff's argument that the Air Force disciplinary authority and the ANG's disciplinary authority are mutually exclusive. The Board noted the double jeopardy discussion in the 2014 opinion when summarizing the relevant legal authorities, although it did not rely on it in the findings and conclusion section. AR 237.

Nor does Plaintiff's reliance on *United States v. DiMuccio* support his argument. Plaintiff cites *DiMuccio* as authority for his assertion that "[n]obody except the Secretary of the Air Force can take administrative actions against Air National Guard officers regardless of their status." ECF No. 31 at 26 (citing *DiMuccio*, 61 M.J. at 591). But *DiMuccio* does not hold that only SECAF has the authority to issue adverse administrative actions to ANG members for misconduct in Title 10 status, nor did that case involve administrative discipline. In *DiMuccio*, the accused, an Arizona ANG member, submitted a specimen for urinalysis during a command inspection of his wing ordered by his Title 32 commander. 61 M.J. at 588. At the time of the inspection, the accused, whose urinalysis test result was positive, was on federal active duty in Title 10 status. *Id.* In the

subsequent court-martial proceeding, the military judge found that the accused's positive urinalysis test result was inadmissible because the Title 32 commander lacked inspection authority over any Airman in his unit who was mobilized in Title 10 status. *Id.* The U.S. Air Force Court of Criminal Appeals upheld the decision. *Id.* at 593. The material inquiry for the court was whether the accused was part of the ANG unit at the time of the inspection. *Id.* at 589.

Plaintiff's attempt to analogize his case to *DiMuccio* is unpersuasive. First, *DiMuccio* involved the admissibility of a drug test obtained during an inspection under Military Rule of Evidence 313(b). *Id.* The court reasoned that DiMuccio "was not part of the 'unit, organization, installation, vessel, aircraft, or vehicle' being examined in the inspection," *id.* at 591 (quoting Mil. R. Evid. 313(b)), a requirement of a lawful inspection under Rule 313(b), because he "was not one of the 'unit military members' under the [Title 32] Commander's command," *id.* at 592. Unlike a command-ordered inspection, Plaintiff's first LOR involved administrative disciplinary action imposed while both Plaintiff and Colonel Vargas were in Title 32 status. *DiMuccio*'s holding is thus cabined to the facts: a Title 32 commander has no *inspection authority* over an Airman mobilized in Title 10 status. *DiMuccio* does not support a holding that a Title 32 commander has no disciplinary authority over a Title 32 Airman for his conduct while in Title 10 status.

In sum, Colonel Vargas had both regulatory and inherent authority to issue the first LOR to Plaintiff, who was then in Title 32 status. Plaintiff has cited no authorities that support his claim that Colonel Vargas' authority was limited because Plaintiff was in Title 10 status at the time of the misconduct, and indeed the two JAG opinions referenced in the record suggest otherwise. Although the Board improperly relied upon the federal nexus analysis in rejecting Plaintiff's argument that Colonel Vargas lacked authority to issue the first LOR, it reached the right conclusion.

### D. Plaintiff Had an Opportunity to Rebut All the Evidence Against Him.

Plaintiff argues that the first LOR was procedurally improper because it relied on evidence that Plaintiff was not allowed to rebut. *See* ECF No. 31 at 24–25. The specific evidence to which Plaintiff refers are two additional witness statements that Colonel Vargas obtained, which reported that Plaintiff and Major A.M. kissed while on temporary duty in Las Vegas. *Id.* at 25. These statements are not in the Administrative Record, but Plaintiff attached them to his Response.[15] *See* ECF No. 35 at 28–35. One of the statements appears to be signed by Colonel Vargas as a witness, and both statements were taken in early January 2018. *See id.* at 29, 32. Plaintiff's argument that his lack of rebuttal opportunity makes the first LOR procedurally improper fails for at least two reasons.

First, the only evidence that Plaintiff cites to demonstrate that Colonel Vargas relied on additional witness statements in deciding to issue the first LOR is his legal brief submitted to the Board on remand. *See* AR 482. Attorney argument, however, is not evidence. *FastShip, LLC v. United States*, 892 F.3d 1298, 1309 (Fed. Cir. 2018). Moreover, Plaintiff's allegation is inconsistent with the facts because the two additional witness statements were taken *after* the first LOR was issued. The statements were signed on January 9, 2018, and January 13, 2018, respectively. *See* ECF No. 35 at 29, 32. Colonel Vargas issued the first LOR on June 13, 2017, more than six months earlier. AR 654. Thus, any contention that the statements underlay Colonel Vargas's decision to issue the first LOR cannot be true.

---

[15] Plaintiff did not move to supplement the Administrative Record with these statements; however, the Court finds them necessary for meaningful judicial review of Plaintiff's procedural argument, which is a valid ground on which to challenge the D.C. ANG's decisions. *Fisher*, 402 F.3d at 1176–77 ("When there is a question of whether reasonable process has been followed, and whether the decision maker has complied with established procedures, courts will intervene, though only to ensure that the decision is made in the proper manner."); *see also Axiom Res. Mgmt. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (describing supplementation standard).

Moreover, based on the evidence in the record, the Court can only speculate as to whether Colonel Vargas relied on the statements in making any subsequent decisions relating to Plaintiff's LORs. For example, Colonel Vargas's decision to maintain the first LOR was signed on January 9, 2018, the same day that one of the witness statements was taken, although that statement does not indicate that Colonel Vargas was present for the interview or reviewed the statement before deciding to maintain the first LOR. *Compare* AR 656 *with* ECF No. 35 at 29. Colonel Vargas issued the second LOR on January 26, 2018, after the dates of both witness statements, but that LOR reprimanded Plaintiff for entirely separate reasons unrelated to Major A.M. (namely, fraternization and false statements). *See* AR 354. The two additional witness statements are therefore irrelevant to the second LOR and, regardless, Plaintiff asserts his procedural challenge to only the first LOR. Importantly, neither LOR indicates in any way that Colonel Vargas considered the witness statements either in deciding to initially issue the reprimands or to maintain the reprimands after reviewing Plaintiff's rebuttal submissions. Plaintiff points to his OPR rebuttal submission containing his allegation that Colonel Vargas "gathered" the witness statements after Plaintiff submitted his first LOR rebuttal, but such allegation is not supported by any additional facts. ECF No. 35 at 18–19 (quoting AR 163). Accordingly, Plaintiff has not met his burden to demonstrate that the first LOR was procedurally defective because he was deprived of his opportunity to rebut evidence.

The only document in the record that indicates consideration of the two additional witness statements is Brigadier General Bozard's curtailment decision. *See* 564 (listing as attachments "Two additional witness statements, Jan 2018"). Plaintiff had the opportunity to rebut that decision, including any rebuttal addressing the attached witness statements. *See id.* (advising that Plaintiff had seven calendar days to submit a written rebuttal statement). Even assuming Colonel

Vargas considered the witness statements, Plaintiff conceded at oral argument that submitting a rebuttal to the curtailment decision would cure any harm from the lack of rebuttal opportunity with respect to the first LOR. *See* ECF No. 45 at 28:11–15 ("So I would concede that if we have in the record a rebuttal from Mr. Torrence to the Bozard curtailment, and if that includes a rebuttal to the statements, that that would cure the unrebutted evidence."). Of course, whether Plaintiff *in fact rebutted* the curtailment decision is immaterial to his procedural argument, which instead focuses on whether he had *the opportunity* to do so. *Id.* at 28:16–24; *see also id.* at 29:18–19 (conceding that such conclusion is "logical"). Accordingly, Plaintiff has not met his burden to demonstrate a prejudicial procedural error with respect to his first LOR.[16]

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 31) is **DENIED**, and the Government's Cross-Motion for Judgment on the Administrative Record (ECF No. 34) is **GRANTED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**

Dated: August 10, 2026

*<u>/s/ Kathryn C. Davis</u>*
KATHRYN C. DAVIS
Judge

---

[16] Plaintiff is correct that the Board's remand decision did not address this procedural argument. *See* ECF No. 35 at 19. But where the curtailment decision clearly shows that Plaintiff was given an opportunity to rebut the two additional witness statements, thus curing any earlier hypothetical procedural error, "the result is foreordained." *Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1291 (Fed. Cir. 2020). Remand is thus unnecessary.